EMSWILER
*v.*
BURHAM.

## John J. Webster, Guardian *v.* Thomas M. Smith.

The defendant had applied for the curatorship of a deceased minor, alleging that the father and mother were dead, and that the child had property. Afterwards, when the legal heir of the minor child claimed the property, the defendant set up ownership in himself. It appeared from the evidence, that he had executed a deed of gift of the property in question to the mother of the deceased minor, before her marriage. This deed, he contended, did not transfer the property. *Held:* That the declarations in his petition for curatorship, and other subsequent proceedings, were judicial confessions of the right of property being in the deceased minor, and that the effect of those confessions could not be obviated under the allegation that they were made in error of law. C. C., 2270, 2264, 2266.

APPEAL from the District Court of Union. *Copley,* J. *Baker,* for plaintiff, contended: 1. If the court should be of opinion that the lower court could not go into the investigation of title, then, is it contended, that the property in controversy was the property of the minor, *Thomas Smith Heard,* and descended to *George Franklin Heard,* the plaintiff, as heir-at-law. Let us, then, consider the effect of this deed of *Smith* to *Emily S. Traylor.*

This deed, at common law, would be termed an entail or fee tail, and its effect would have been, before the statute *de donis,* termed a base or qualified fee, and construed so as to vest a fee simple in *Emily S. Traylor,* for certain purposes, on the condition that she had the heirs described, 4 Kent, 10, 11, 12. 2 Blackstone, 110, 111, 112, and note, Chitty's ed., vol. 1, p. 87. Fearne on Remainders, p. 28 and note. See, also, the rule in *Shelly's* case, 4 Kent, 214 to 232. But the statute *de donis conditionalibus* took away the power of alienation on the birth of issue, and the courts divided the estate into a particular estate in the donee, and a reversion in the donor, so that the donee, on the birth of issue, could not alien, so as to bar or charge his issue, or, for default of issue, the donor or his heirs. 4 Kent, 12 to 22 and notes. 1 Blackstone, 2d book, Chitty's ed., p. 88, marginal page 112; so that, after the statute *de donis, Emily S. Traylor* took a life estate, and after issue of her body, that issue was vested with the fee simple; there was no longer a possibility of reversion to the donor. But this deed was executed in Alabama, a common law State; there, negroes are personal property; personal property cannot be entailed. *Emily S. Traylor,* under this view, took an absolute title. On her marriage it vested in her husband, and, on his death, in his son, the plaintiff. Chitty's Blackstone, 2d book, p. 89, note 17, marginal page 113, *et seq.*

2. Entails have not been favored in this country, and we find that so early as 1776, they were abolished in Virginia. 4 Kent, note 'A,' p. 14. The general policy of the country does not encourage restraints upon the alienation of property, because, among many other reasons, of the effect they have of encumbering property and tying it up out of the hands of commerce, and we accordingly find, that so early as 1812, the Territorial Legislature of Alabama enacted a statute which converted every conveyance of lands or negroes, which had been, or might thereafter be, created an entail, into a fee simple, with the pro-

WEBSTER
*v.*
SMITH.

viso alone that lands might be entailed to a succession of donees, then living; in default thereof, to the right heirs of the donor. Alabama Statute, p. 157, ¶ 37. See, also, Porter's Alabama Rep., vol. 3, p, 69, *Simmons* v. *Augustine.* The court will observe that the proviso is restricted to lands, and not negroes. The construction put upon a deed in Alabama, in which the proviso is not inserted, by the highest tribunal in that State, is that the first taker is vested with a fee simple if lands are the subject of the deed. *Ergo,* the proviso being silent as to negroes, if negroes are the subject of the deed, the first taker is vested with the absolute unfettered fee simple. 3 Porter's Ala. Rep., 69. Again, as to consideration. It was executed in Alabama, the *situs* of the parties and property at the time, and where the common law prevails. At common law, love and affection are a good consideration. Money or marriage is a valuable consideration. 2 Blackstone, 295, 296. 4 Kent, 461, *et seq.* There is, then, in this deed, expressed both a good and a valuable consideration. If, then, the contract is to be governed by the *lex loci,* there cannot be a doubt but that the courts in Alabama would give effect to this deed, and in favor of the claim of the plaintiff. 9 Wendall, 235. 20 Johnson, 87, and cases cited.

3. But it was argued strenuously that this deed was void, because, it is urged, there was no livery of seizin. Now, it is worthy of observation that livery of seizin was part of the ancient ceremony of feudal investiture; in those early times every feoffment was accompanied with actual delivery of possession. The notoriety and solemnity of the livery were well adapted to the simplicity of unlettered ages. The actual livery was performed by the feoffor entering with the charter of feoffment, and, delivering a clod, turf, or twig, or latch of the door, in the name of seizin of all the lands contained in the deed. "The charter itself was not requisite; the fee was capable of being conveyed by mere livery in the presence of the vicinage." 4 Kent, 479, *et seq.*

But the exigencies of commerce, and the necessities of a more extended civilization, and especially the great proclivity of courts and Legislatures of modern times, and in these United States, to favor the easy transmission of property by unfettering those restraints with which all landed property in England was burthened, has greatly relaxed the observance of the technical doctrine of livery, or rather give greater force to the charter or deed, its delivery to the vendee or donee, or record of the same. Hence we find the doctrine now well settled, that the delivery of the deed or record of it to be good as between the parties, without the party claiming being required to prove livery of the property. *McRae* v. *Pegues Administrator,* 4 Ala. Rep., 159. Clay's Ala. Digest, 254, title Fraud and Fraudulent Conveyances, sec. 2. Ib. sec. 8. *Pray* v. *Pierce,* 7 Mass. Rep., 381. 13 L. R., 230. 2d Ann. 52. Smith's Leading Cases, Law Library, 18, 4th series. *Twyne's* case, pp. 33, 44, *et seq.* In all these cases, as between the parties, the deed is valid. See, also, Clay's Alabama Dig., p. 156, ¶ 33, 38.

The delivery was sufficient in law, the deed was acknowledged and recorded in the proper office in Alabama, and the original given to *Emily S. Traylor,* it was produced and proven by the plaintiff on the trial of the cause.

Again, if the court please, *Emily S. Traylor* is styled in the deed the adopted daughter of the donor, *Smith.* It is proved that *Thomas M. Smith* raised her; she was married at his house; she and her husband continued to reside there until her death, and, after her death, *Smith* acknowledged that he held the property for the child. In every case of mixed possession, the seizin is according to the title. *Conner* v. *Winslow,* 10 Mass. Rep., 146. *Brimmer* v. *Long Wharf,* 5 Pickering, 131. 3 N. S. 337. *Wafer* v. *Pratt,* 1 R. R., 42. The possession, even if in *Smith,* is consistent with the terms of the deed and the situation of the parties. *Vide Twyne's* case, above cited, p. 48, *et seq.* The property was, subsequently to the death of *Emily S. Traylor,* delivered to her son, *Thomas Smith Heard,* who died in possession.

4. Should this court, however, decide that the property changed its character in coming into Louisiana, and that the courts of Louisiana will not take notice of the complicated system of entails, reversions and remainders with which the common law abounds, and throw entirely out of view this Alabama deed, then, we say, with equal confidence, the plaintiff must succeed, because, in July, 1844, defendant filed a petition in the probate court of Union, stating that *Thomas Smith Heard* had property in the parish, provoked the appointment of a tutor, caused an inventory to be made, signed that inventory, and gave in this property as that of the minor, *Heard.* The day the minor died (July 7th, 1845), wrote

to *Heard*, the minor's uncle, stating that the minor's property consisted of twelve negroes, formerly given by him; applied for and procured the appointment of curator; made another inventory; gave bond; acknowledged to *J. C. Traylor* and other witnesses, that he held the property for the minor. These acts, oft repeated, amount to a judicial confession, are full proof and cannot be revoked. C. C. 2270, 2264, 2266. Pothier, Evans' ed., p. 407, Nos. 797, 798, 801, 806, *et seq.* Smith's Leading Cases, vol. 1, Law Library, No. 19, 4th series, pp. 382, 531, 555.

*McGuire* and *Ray*, for defendant, contended : The attempt, by plaintiff, is to show that this property was donated to *Emily S. Traylor*, by the defendant, in September, 1839, or that if he did not give it to her, he gave it to her child in Louisiana, for proof of which he relies upon the various probate proceedings in evidence, and a letter from defendant to *F. C. Heard*, dated July 7th, 1845, a brother of *George Felix Heard*, in which he says: "I have given to his child thirteen negroes, and to himself $1000 or $1200." This is no proof of a donation to *Emily S. Traylor*, and is not in form to make a donation to any one. C. C. 1523.

This, then, amounts to an admission that the property once belonged to defendant, and it is proven by evidence of *J. C. Traylor* given upon the trial in 1849, and received on this trial under the agreement. He says he saw those negroes in the possession of defendant, in Alabama, for many years—fifteen or more—and he treated them as his own. *Wm. Ham* says defendant brought part, perhaps the whole of the property, here from Alabama in 1840. Then he held them for fifteen years before 1840, which is sufficient title in him. C. C. 3417, 3438, 3439, 3465.

Slaves are personal property in Alabama. To make a gift thereof at common law, and we believe it is not changed by any statute of Alabama, there must be a delivery and acceptance. 2 Kent, 438. *Noble* v. *Smith*, 2 Johnson, 55. *Pearson* v. *Pearson*, 7 Johnson, 27. *Fink* v. *Cox*, 18 Johnson, 148. *Cook* v. *Hunter*, 12 Johnson, 189. 2 Blackstone, 442. *Sims* v. *Sims*, 2 Ala. Rep. 118. *Blakeley* v. *Blakeley*, 9 Ala. Rep. 394. *McRae* v. *Pegues*, 4 Ala. Rep. 163.

If, for argument, we admit the deed of gift, it would not pass the title without acceptance and delivery of deed. C. C.-1523, 1530, 1531. The recording of a deed does not amount to a delivery. *Maynard* v. *Maynard*, 10 Mass. 456. *Harrison* v. *Trustees*, 12 Mass. 460. *Mills* v. *Gore*, 20 Pickering, 33. *Church* v. *Gelman*, 15 Wendall, 658. 2 Blackstone, 307. *Jackson* v. *Phipps*, 12 Johnson, 421. *Sheppards* v. *Touchstone*, 5 Law Library, 117, 120, 122.

Natural affection is a good consideration for a gift to a blood relation, if executed by delivery and acceptance; but if without delivery and acceptance, the execution cannot be enforced, unless for a valid consideration. 2 Blackstone, 441, 442. 2 Kent, 438. 1 Cowan, 638. *Jackson* v. *Caldwell*, 16 Johnson. *Jackson* v. *Seabring*.

Plaintiff, not having alleged title by donation to *Emily S. Traylor*, or to *Thomas S. Heard*, but only as heir to *Thomas S. Heard*, calculates that if he proves title in either, he must succeed. We think we have shown want of title in *Emily*. Now, in relation to title in *Thomas S. Heard*, he can have none, unless defendant gave it to him in Louisiana, where it could only be done by authentic act, (C. C. 1523,) and accepted in the same manner (C. C. 1527) by the donee (1530). If donee dies, his heirs cannot accept (1531), and nothing short of this form will render valid a donation. *Packwood* v. *Dorsey*, 6 R. R., 330. Want of form cannot be cured by any other form. There is no evidence offered to show that *Emily S. Traylor* ever knew of the donation, or that she ever claimed the property : she died in Alabama in September, 1840. Now, we admit that *Emily S. Traylor* was sister to defendant's wife, and that she lived with them from a child, and he was very fond of her, and that he intended to give her the property, and that after her death, he intended to give the property to her child; hence his acts in the different probate proceedings in evidence. But, we contend, that, fortunately for him, he never carried that intent into execution so far as to divest himself of title, and be compelled to give it up to an entire stranger; and we believe the reason why he did not vest the title in her child, *Thomas S. Heard*, was the fear it might die, and defeat his object; and the only reason for his applying for the curatorship, was to get the property in possession, as there was no person here contradictorily with whom he could decide the title, and it was necessary to relieve *J. C. Traylor*, the tutor, from responsibility.

The judgment of the court was pronounced by

PRESTON, J. The following facts appear by the records of the late probate court of the parish of Union:

On the 22d day of July, 1844, the defendant, *Thomas M. Smith*, presented a petition to that court, in which he stated that *George Felix Heard* and *Emily S. Traylor*, his wife, were both dead; that they left a minor child, named *Thomas Smith Heard*, then in that parish; that the property which the minor owned was principally in that parish, and consisted of about ten negroes, which he had given to the mother of said minor. He asked that *Josiah C. Traylor*, the uncle of the minor, might be appointed his tutor, and himself the under-tutor. He was appointed and sworn, as the under-tutor, and, after proper proceedings, *Josiah C. Traylor* was appointed and qualified the tutor of the minor.

The tutor, on the 31st of July, 1844, made an inventory and appraisement of the property of the minor, which consisted of thirteen slaves, appraised at $3700. The inventory was signed by the defendant, and, at the bottom, it was stated that the property was deeded by him, *Thomas M. Smith*, as would more fully appear by reference to a copy of the deed hereunto annexed. This copy of the deed was then recorded in the parish of Union, and is identified by the testimony of the late probate judge of that parish. It is dated on the 10th of September, 1839, in Perry county, in the State of Alabama, and declares, substantially, that *Thomas M. Smith*, in consideration of the love and affection which he entertains for his adopted child and daughter, *Emily S. Traylor*, he gives her ten slaves, naming them, for the term of her natural life, and, at her death, he gives and confirms the negroes, with the increase of the females, to the heirs of her body, to have and to hold the slaves to them, and the heirs of their bodies, forever.

Under the inventory, accompanied by this deed, *Josiah C. Traylor*, the tutor of the minor, was put in possession of the slaves by the defendant, as being the property of the minor, and held it for him until his death. The documents and evidence thus referred to, leave not a doubt that the property belonged to the minor, *Thomas S. Heard*. The deed of gift to his mother, during life, and to him, after her death, made in Alabama, was now, at least, executed, by the delivery of the slaves to his tutor, and the registry of the deed in the parish where he resided with the property. The probate proceedings, carried on by the defendant, amount to a judicial confession on his part, that the property belonged to the minor. Code, 2264, 2266, 2270. Even if we supposed, which we do not, that he was in error of law, as to the effect of his deed of gift, he could not revoke his judicial confession, and it affords the legal presumption that the slaves belonged to the minor. Art. 2264. We have no doubt the minor could have recovered the slaves from his tutor, had he arrived at the age of majority, notwithstanding any intervention or claim of the defendant, *Smith*.

But the minor died on the 7th of July, 1845, when the defendant applied for the curatorship of his vacant estate, alleging that he left a considerable estate of property, real and personal, situated in the parish of Union. He was appointed. Twelve slaves were inventoried, and appraised at the sum of $3675, but the curator made a note at the bottom of the inventory, that he claimed them by virtue of a deed of gift, of which a copy was filed in the probate judge's office, on the 31st July, 1844. It is the same deed of gift, by which, as we have seen, he acknowledged that he divested himself of the slaves in favor of the deceased, whose estate he was administering, and his mother. The pretence, therefore, that he applied for the curatorship of the succession, merely to get his own pro-

perty into his possession, and relieve the late tutor of the minor from responsibility, is unfounded in law. He holds the property, as the curator of a vacant succession, for the real heir.

The question then arises, has the plaintiff established that he is the true and only heir of the deceased minor, *Thomas S. Heard.* The probate proceedings show that *Emily S. Traylor,* the mother of the minor, and wife of its father, *George F. Heard,* died without any other issue. It is alleged that *George F. Heard,* the surviving father, went to Texas, married *Mary Ann Webster* in November, 1842; that *George Franklin Heard,* born in 1843, was the only issue of this marriage; that the father died in 1844, and that the plaintiff is the guardian of the minor child, who is the legal heir of his half-brother, who died in Union parish on the 7th of July, 1845.'

That *Mary Ann Webster* gave birth to the child, in 1843, while living with *George F. Heard,* as man and wife, and that he died in 1844, is fully established by evidence. The only fact seriously contested, is their marriage, in 1842. A minister of the gospel swears, that he married them, in the Republic of Texas, in the fall of 1842, according to the laws and usages of the Republic, as far as he knows them, and that they lived together afterwards as man and wife, until the husband's death, leaving one child, issue of the marriage. The marriage took place to the personal knowledge of *Mary A. Saunders,* and other witnesses corroborate the fact. A duly authenticated copy of the marriage license, and return of its execution by the minister, is produced. It was issued by the deputy clerk of Harrison county; but then it is authenticated by the clerk and chief justice of the county court, as a record of the court; and the whole recognized by the Secretary of State of the State of Texas; and this record, in connection with the testimony of the minister, who must have had some knowledge of the laws and usages of Texas, as to the celebration of marriages, affords *prima facie* evidence that the marriage was legal, and that the parties were legally, as well as in good faith, man and wife. Their married state has never been impeached. The plaintiff shows, by a duly authenticated record, that he has been appointed guardian of the minor, in the State of Texas, and has given security in the sum of six thousand dollars, for his faithful administration. He is entitled, on complying with the requisitions of the act approved the 1st of April, 1843, to remove his ward's property out of the State, and to the place of their residence.

We are of opinion, therefore, that the minor, *George Franklin Heard,* should be recognized as the only heir of his deceased half-brother, *Thomas Smith Heard,* and that the defendant, as curator of the vacant succession of the latter, is bound to render to the plaintiff his account, as curator, and deliver over to him the property of the succession, after paying the debts.

The judgment of the district court is reversed; the minor, *George Franklin Heard,* is recognized as the legal heir of *Thomas Smith Heard;* and it is decreed, that the plaintiff, as his guardian, shall recover the estate of the deceased. The case is remanded for further proceedings according to law, and the defendant condemned to pay the costs of the appeal.